Linda L. HENRICH, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.

No. C02–4006–MWB.

United States District Court, N.D. Iowa, Western Division.

July 10, 2003.

David A. Scott, Cornwall Avery Bjornstad Scott, Spencer, IA, for Plaintiff.

Martha A. Fagg, U.S. Attorney's Office, Sioux City, IA, for Defendant.

## ORDER REGARDING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION

BENNETT, Chief Judge.

This matter comes before the court pursuant to United States Magistrate Judge

Paul A. Zoss's May 1, 2003, Report and Recommendation in this judicial review of the decision by an administrative law judge (ALJ) that plaintiff, Linda L. Henrich (Henrich) is not entitled to a period of disability or disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act. Henrich sought such benefits on the basis of a disability involving a combination of physical and mental impairments, which are the results of alleged chronic back pain, migraine headaches, borderline intellectual functioning and depression. However, the ALJ's denial of benefits was affirmed at each subsequent stage of the administrative procedure, and thus became the decision of the Commissioner of Social Security.

Judge Zoss concluded that the ALJ's decision to deny Henrich's application for benefits had been in error because the ALJ had found that Henrich's subjective complaints of pain were not credible and there was not substantial evidence to support the ALJ's decision. Judge Zoss found that "the ALJ failed to conduct a proper *Polaski* analysis that gave appropriate consideration both to Henrich's subjective complaints and to the expert opinions of record." *See* Report and Recommendation, Doc. No. 14 at 31. Judge Zoss concluded that the improper credibility analysis resulted in the ALJ discounting all the opinions, both from the medical experts and from the vocational expert (VE), that relied to any extent on those subjective complaints. Report and Recommendation, Doc. No. 14 at 31. Judge Zoss found further that the ALJ improperly substituted his judgment for that of the experts, and failed to provide adequate justification for doing so. *See* Report and Recommendation, Doc. No. 14 at 32. Judge Zoss, therefore, recommended that judgment enter in favor of Henrich and against the Commissioner, and that her case be reversed and remanded to the Commissioner for calculation and award of benefits. Report and Recommendation, Doc. No. 14 at 33. On May 9, 2003, the Commissioner filed objections to Judge Zoss's Report and Recommendation. The thrust of the Commissioner's objections is that Judge Zoss essentially reversed the ALJ's decision because he found that the ALJ did not properly evaluate the credibility of Henrich's subjective complaints and that the ALJ used this flawed analysis to discount the opinions of the medical experts and the VE. The Commissioner objects to Judge Zoss's recommended remedy and contends that if the ALJ did not conduct a proper credibility analysis and/or if he did not properly consider the opinions of medical experts and the VE, remand, for further administrative proceedings, is the appropriate remedy not reversal.

█ The standard of review to be applied by the district court to a report and recommendation of a magistrate judge is established by statute:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1). The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required. *See, e.g., Hosna v. Groose,* 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied,* 519 U.S. 860, 117 S.Ct. 164, 136 L.Ed.2d 107 (1996); *Grinder v. Gammon,* 73 F.3d 793, 795 (8th Cir.1996) (citing *Belk v. Purkett,* 15 F.3d 803, 815 (8th Cir.1994)); *Hudson v. Gammon,* 46 F.3d 785, 786 (8th Cir. 1995) (also citing *Belk* ). The Commission-

er has made specific, timely objections in this case; therefore, *de novo* review of "those portions of the report or specified proposed findings or recommendations to which objection is made" is required here. *See* 28 U.S.C. § 636(b)(1).

Because *de novo* review has been triggered as to whether the ALJ properly evaluated the credibility of Henrich's subjective complaints and properly discounted the opinions of the medical experts and the VE, and further, whether there was substantial evidence to support the ALJ's decision, the court finds that it is well to consider the standard of review that this court must apply to the Commissioner's denial of benefits. The Eighth Circuit Court of Appeals has described the applicable review as "narrow:"

> "We will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir.1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Id.* If, after reviewing the record, the Court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the commissioner's decision. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir.2000). Even if we would have weighed the evidence differently, we must affirm the denial of benefits if there is enough evidence to support the other side. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir.1992).

*Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001). Although this review is "narrow," the Eighth Circuit Court of Appeals has also explained that, " '[i]n reviewing administrative decisions, it is the duty of the Court to evaluate all of the evidence in the record, taking into account whatever in the record fairly detracts from

the ALJ's decision.' " *Hutsell v. Massanari*, 259 F.3d 707, 714 (8th Cir.2001) (quoting *Easter v. Bowen*, 867 F.2d 1128, 1131 (8th Cir.1989)); *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir.2001) (" 'In assessing the substantiality of the evidence, we must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it.' ") (quoting *Black v. Apfel*, 143 F.3d 383, 385 (8th Cir.1998), with internal quotations and citations omitted).

The court will now consider whether the ALJ failed to conduct a proper *Polaski* analysis and impermissibly discounted Henrich's credibility in violation of *Polaski*. In addition, the court will consider if there is substantial evidence in the record to support the ALJ's determination that Henrich is not credible and whether the ALJ properly discounted the opinions of medical experts and the VE that relied on Henrich's subjective complaints.

■ Judge Zoss recommends reversing the ALJ's decision because "psychological findings, coupled with the medical evidence that Henrich has suffered from chronic pain for a lengthy period of time, and doctors' opinions that something, as yet largely undetermined, is going on in Henrich's back, constitute substantial evidence to support Henrich's current disability claim." Report and Recommendation, Doc. No. 14 at 32. The court now considers whether the ALJ failed to conduct a proper *Polaski* analysis that gave appropriate consideration both to Henrich's subjective complaints and to the expert opinions of record.

The Eighth Circuit Court of Appeals has explained that:

> When an individual's subjective complaints of pain are not fully supported by the medical evidence in the record, the ALJ may not, based solely on his personal observations, reject the complaints

as incredible. (citations omitted). Rather, the ALJ must consider all the evidence relating to the claimant's subjective complaints, including his previous work record, and observations by third parties and treating and examining physicians relating to his daily activities; the duration, frequency and intensity of the pain; precipitating and aggravating facts; dosage, effectiveness and side effects of medication; and functional restrictions. *See Polaski v. Heckler,* 751 F.2d 943, 948–50 (8th Cir.1984). If, based on the *Polaski* factors, the ALJ determines that the claimant's subjective complaints are not fully credible, he must make an express credibility finding and give his reasons for discrediting the claimant's testimony.

*Jones v. Callahan,* 122 F.3d 1148, 1151 (8th Cir.1997). The ALJ did consider Henrich's previous work record. The court has reviewed the evidence before the ALJ regarding Henrich's work record and finds the evidence supports the following conclusion made by the ALJ:

> Although having injured her back in March 1996, her alleged disability onset date when filing her previous application for disability insurance benefits in September 1997, the claimant continued to perform work activity at the nursing home consistent with reduced functional capabilities as placed upon her by Dr. J. Michael Donohue in the fall of 1996 (Exhibit B3F, pages 1–7).

> .    .    .    .    .

> The claimant's earnings in her work activity as a nurse aide in 1996 were almost $9,000.00 and in 1997 were almost $8,000.00 Additionally, earnings through September 1998, when she discontinued work activity were almost $6,000.00 (Exhibit B2D, page 4) The claimant testified

at the hearing she did not leave her employment at the nursing home by reason of her medical condition. To the contrary, she noted the nursing home was "not about to fire her." The claimant continued working. She made beds, fed residents, and took temperatures. She quit working at the nursing home in Sioux Rapids, Iowa as her husband had obtained new employment locally in Okoboji, Iowa, and no longer had to commute to his previous job. . . . The claimant stated she could not afford to drive back and forth.

> .    .    .    .    .

> Based on the discussion above, it is clear the claimant continued to perform work activity as a nurse aide at substantial gainful activity levels subsequent to her reported back injury in March 1996 up to September, not the first,[1] 1998, the claimant discontinuing work activity at that time for reasons unrelated to her medical condition or functional capabilities.

(R. at 14–15). The court notes the ALJ's discussion of Henrich's previous work record included Henrich's work activity of mowing grass on a riding lawnmower. (R. at 15–16). A review of the record supports the ALJ's statement that:

> The claimant testified upon discontinuing her work activity at the nursing home, she tried to help her husband in his job. She tried to use a riding mower, but that it was too hard. She also testified she last performed that work activity in October 1999. She said she could ride the mower for no more than one-half hour at a time as the pain was too much for her. She subsequently testified her work activity mowing in the mobile home part was performed on

---

1. The court is not clear as to the reference, meaning and purpose of this statement and assumes that it is a clerical error.

only a part-time basis. She acknowledged making approximately $6,000 in 1999. She stated she quit working in 1999. However, when questioned by the undersigned in regard to a reference in the record in May 2000 that the claimant was still working (See Exhibit B5F, page 1), the claimant testified she might have been working part-time a little bit. (Testimony) ... In contrast, ... the claimant's husband testified the claimant did not work at all in calendar year 2001, but had worked up to September 2000 when she quit working.

(R. 15–16). Further, the ALJ considered Henrich's daily activities and work activities:

Both claimant and her husband testified the claimant's performance of daily activities are consistent with work activity performed at the sedentary to light exertional level, at most. (Testimony) In May 2000 the claimant described daily activities performed at, perhaps, the light exertional level (Exhibit B5F, page 1). However, the undersigned notes the claimant reportedly injured her back in March 1996 and has since performed substantial gainful activity on a regular and sustained basis up to at least September, not the first, 2000, at the light exertional level (Exhibits B2D, B3D, B1E, page 3, B6E, B12E, and testimony). Performance of said work activity reflects negatively on the credibility to be given the testimony of both the claimant and her husband as to the claimant's experience of pain with resultant functional limitations.

(R. at 18–19). More specifically, Henrich testified that she gets up in the morning and takes a hot bath and sits for a while, watches television and walks around in the house (R. at 46, 125), she cooks and she can write (R. at 50–51), she does her own laundry and she shops for groceries (R. at 290), she has a driver's license and transports herself as needed. (R. at 126). The record includes the fact that Henrich does manage her own financial affairs and maintains a checking account (R. at 126), has been married approximately seven years and has grown children (R. at 36). Further, the record includes the fact that Henrich went through "nurses training" to become a certified nursing assistant. (R. at 35). The ALJ did consider the duration, frequency and intensity of Henrich's pain:

There are additional factors in the record diminishing the credibility to be given the testimony of the claimant and her husband as to the presence and severity of pain experience by the claimant.... Although complaining of low back and left lower extremity pain resulting in significant functional limitations, the claimant did not seek any type of medical treatment between May 1997 and May 2001.... She worked at substantial gainful activity levels up to at least September, not the first, 2000, a date seven months subsequent to filing her current application for disability insurance benefits. Yet, other than for undergoing a consultative physical evaluation paid for by the Disability Determination Services on February 29, 2000 (Exhibit B4F), the claimant still did not seek any type of medical treatment for complaints of back or left lower extremity pain until May 2001 (Exhibit B6F, pages 1 and 2).

(R. at 19). In addition, the ALJ noted that the record reveals that it was not until undergoing the consultative evaluation on February 29, 2000, when Henrich was seeking an award of disability benefits, that she, for only the second time since 1997, mentioned to a medical professional that she experienced migraine headaches. (R. at 285). Henrich alleged during that evaluation that she experience migraine headaches on a frequency of one a month. (R. at 285). However, the ALJ noted that when Henrich was undergoing a psychological consultative evaluation on May 23,

2000, as part of the disability evaluation process, she alleged that she experienced migraine headaches two times a week. (R. at 22). The ALJ concluded that the allegations of the migraines were simply not supported by medical evidence, or by the previous conduct of Henrich.[2] The ALJ found that the alleged migraines were not frequent or severe enough to result in a functional limitation. The fact that Henrich had only mentioned experiencing migraine headaches twice within approximately a three year period to a medical professional reflects negatively on her credibility that she experiences migraines frequently. In addition, the ALJ determined these allegation of migraines further diminished Henrich's credibility as to her other assertions of various impairments.

The ALJ considered Henrich's allegation of depression and concluded that Henrich "does not experience depression, or, if so, that it only constitutes a 'not severe' impairment" because she had never sought medical treatment, or used any medications for the treatment of depression or undergone any counseling for depression. (R. at 18). The court has reviewed the record and finds that Henrich did not allege depression until after she had filed her disability application and was being evaluated by a Department of Disability Services (DDS) evaluator.

As for precipitating and aggravating factors the ALJ noted that even after her alleged back injury, in March 1996, and up to September 1998, Henrich's income from employment at the nursing home remained approximately the same. When Henrich finally did quit working at the nursing home, she left for reasons unrelated to her medical condition or functional capabilities. The ALJ noted that Henrich testified she quit because she did not have transportation to her job at the nursing home. Henrich did not leave her job at the nursing home because it was aggravating her condition. She left because she did not have transportation to this job. In addition, the ALJ considered evidence regarding Henrich's performance of substantial work activity after leaving the nursing home. Henrich's job after leaving the nursing home involved mowing lawns and operating riding lawn mowers. The ALJ noted that:

> It appears from the record the claimant's allegations of weakness or a lack of stamina resulting in her discontinuance of work activity mowing lawns may have related more to deconditioning as opposed to the presence and severity of any physical impairment, including pain, resulting in functional limitations upon the claimant as discussed in further detail below.

(R. at 14). The record supports the finding that Henrich mowed laws in 1998, 1999, and 2000. During this time period Henrich did not seek medical treatment for any of her alleged conditions. The ALJ found that Henrich could not be found "disabled within the meaning of the Social Security Act prior to September, not the first, 2000, based upon her performance of substantial gainful activity." The record demonstrates that for approximately seven months after filing for disability

---

2. The court notes that in 1990 (R. at 14), 1991 (R. at 149) and three times in 1995 (R. at 149) Henrich was seen by Arden Keune, D.C. for headaches but when interviewed by David P. Robison, DO, the medical notes included the following, "... she states she gets migraine headaches, although she has never had headaches before this incident in March, 1996."

(R. at 120). This evidence supports the ALJ's conclusion that Henrich's testimony is not credible. Henrich denied having headaches prior to the work incident that occurred in 1996, yet the medical records indicate that she was seen for headaches prior to that incident.

benefits, Henrich continued to perform substantial gainful activity. The evidence supports the ALJ's conclusion that Henrich's alleged disabling condition was not aggravated by her previous work at the nursing home, which she left for reasons other than her alleged disabilities. Further, her work mowing lawns did not aggravate her condition as she never sought independent medical treatment prior to filing for disability benefits. As observed above, Henrich continued to work mowing lawns even after stating that she was disabled in her application for disability benefits. In addition, the record supports the ALJ's finding that although Henrich's borderline intellectual functioning would preclude her from performing complex or detailed work activities, it would not preclude her from performing her past relevant work, either how she performed or how it would be performed in the national economy.

The court finds that the ALJ considered potential precipitating and aggravating factors. In fact, the court is inclined to agree with the ALJ's conclusion that it is Henrich's decreased activity, such as the discontinuance of work activity mowing lawns, and not following an exercise program at home or participating in therapy, that may have related more to deconditioning as opposed to the presence and severity of any physical or mental impairment. The record contains evidence that Dr. J. Michael Donohue encouraged Henrich to participate in physical therapy and recommended that Henrich increase her activity level and pursue therapy, which Henrich declined to do.[3]

The court finds that the ALJ also considered the dosage, effectiveness and side effects of the medication used by Henrich to relieve her impairments. First, this court observes that although Henrich testified that the "pain was to much for her" and that is why she quit mowing lawns, the record reveals the fact that up until the day before her hearing with the ALJ, Henrich took only mild anti-inflammatory medication and no narcotic medication for the pain.[4] At her hearing, Henrich testified that as for her prescription of Mylan and Cyclobenzaprine, that she "just got these," and "started these yesterday." (R. at 44). The fact that Henrich first started taking

---

3. Dr. Donohue's notes contained the following: "Based on objective findings, I do not believe the patient has sustained any impairment. On the long term basis, I anticipate the patient's symptoms to subsequently resolve. I again relayed to her that I believe that if she continues on a home exercise program, her condition will improve." (R. at 273). In addition, Dr. Donohue's notes contained, "I relayed to her that based on findings at this point, I would recommend actually increasing her overall activities and attempt to return to work full duty." (R. at 274). Dr. Donohue noted further, "I relayed to her that she does have some residual strength deficits but that she must bear some responsibility with respect to this condition with her decision not to pursue aggressive rehabilitation." (R. at 274). This contradicts Henrich's testimony before the ALJ:

Q. What's the last thing that Dr. Donnahue [sic] tried to do for you?

A. He sent me to therapy. And it was just so hard on me. I just couldn't do it. So they cancelled it.

Q. So even Dr. Donnahue [sic] recognized that you couldn't, couldn't go—

A. Yeah.

Q. through his program?

A. Right.

(R. at 49).

4. Henrich testified that she was given samples of Ultrum and it made her very drowsy. (R. at 44). She reported that she took Tylenol P.M. for sleep and Tylenol for pain during the day. She reported that she occasionally took Motrin. (R. at 285). She reported using a back brace and TENS unit. (R. at 285). As for her reported migraines she reported that she took Excedrin Migraine pills. (R. at 285). During her hearing, Henrich testified that she took Mylan and Cyclobenzaprine. (R. at 44).

prescription medication for her alleged condition the day before her hearing before the ALJ does bring into serious question the credibility of her testimony regarding experiencing "chronic" pain and the other alleged conditions. Second, the record supports the ALJ's finding that Henrich was not credible regarding her alleged depression because she never sought medical treatment for depression, never mentioned depression to any medical professional until being evaluated by DDS, never used medication for depression, and never sought or underwent any counseling for her reported depression.

The ALJ also considered the treatment that Henrich received for relieving her symptoms; any measures other than treatment that Henrich used to relieve her symptoms and other factors concerning her functional limitations and restrictions due to her symptoms. Henrich's credibility was discounted when the ALJ noted that Henrich sought no medical treatment between May 1997 and May 2001,[5] even though she was covered by health insurance until September 1998. The ALJ found that Henrich failed to provide a credible explanation as to why she did not seek treatment for her alleged disability. Henrich was seen by the DDS medical professionals during the time she was pursuing her application for disability benefits filed September 9, 1997, but these medical visits were part of the disability evaluation process. Henrich testified that she does use a back brace and a TENS unit.[6] (R. at 35, 40). Henrich's condition does not require surgery. (R. at 50). Shortly after her injury in 1996, Henrich was given epidural blocks but she did not think the epidurals helped and no more blocks were given. (R. at 297).

The ALJ did not agree with, or adopt the opinion of medical experts as to Henrich's "borderline intellectual functioning in combination with reported depressive symptomatology" imposing functional limitations on Henrich's ability to perform basic work-related activities on a regular or sustained basis, again, because the ALJ discounted Henrich's credibility as to her subjective complaints. The ALJ did consider the *Polaski* factors and the evidence was substantial enough to support the ALJ's decision. Based on the *Polaski* factors, the ALJ determined that the claimant's subjective complaints were not fully credible and he made an express credibility finding and gave his reasons for discrediting Henrich's and her husband's testimony:

> Testimony of the claimant as to the presence and severity of various impairments alleged, including pain, with resultant functional limitations was exaggerated, generally not credible, and not substantially supported by medical evidence and opinion in record considered

---

5. Henrich was seen by Dr. Pruitt, who had not seen the claimant for four years until seeing her on May 14, 2001. He noted that her x-ray was unremarkable and that the EMG/NCS of her left lower extremity was negative. Dr. Pruitt concluded that if the testing results were unremarkable there would not be much of a basis for disability other than the claimant's allegations of chronic back pain. (R. at 293).

6. Usually abbreviated TNS. Pronounced "tens" it is often typed "TENS" and this clerical error by transcriptionists is not un-

common. A Transcutaneous Nerve Stimulator is an electrical device for the control of pain by blocking pain impulses traveling up the spinal cord to the brain. The electrode is pasted to the skin overlying the spinal cord. The turning of a knob sends a current of electricity into the spinal cord. The current closes a hypothetical gate in the cord and prevents the pain impulses from reaching the brain. Abbreviated TNS. *See* Schmidt, J.E., M.D., *Attorneys' Dictionary of Medicine and Word Finder* T–101–102 (Matthew Bender: New York 1983).

in its entirety. Testimony of the claimant's husband as to his observations of the claimant is accepted as sincere, but does not support a finding of disability within the meaning of the Social Security Act based on the residual functional capacity found by the undersigned in this decision.

(R. at 24).

█ The ALJ discounted the opinions of doctors and the VE that were premised upon full credibility being given to Henrich's subjective complaints because the ALJ found that her allegations of impairments and pain were not credible. As observed by the Eighth Circuit Court of Appeals, "We will not disturb the decision of an ALJ who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain." *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir.1992). The ALJ, in this case seriously considered and provided good reasons for finding the Henrich was not credible as to her subjective complaints. The opinions of doctors and the VE based upon Henrich's subjective complaints of pain were justifiably discounted by the ALJ. This court finds that the ALJ conducted a proper *Polaski* analysis that gave appropriate consideration to Henrich's subjective complaints. This court concludes that the ALJ properly discounted the opinions of doctors and the VE in the record that relied upon Henrich's subjective complaints and that the ALJ's decision was supported by substantial evidence in the record as a whole.

THEREFORE, the Commissioner's May 9, 2003, objections to Judge Zoss's May 1, 2003, Report and Recommendation finding that the ALJ failed to conduct a proper *Polaski* analysis, failed to properly evaluate Henrich's credibility, improperly discounted physicians opinions and incorrectly found substantial evidence to support his decision are sustained. The Commissioner also objects to Judge Zoss's recommended remedy and argues this case should be remanded for further administrative proceedings. The court overrules this objection and finds that Judge Zoss's May 1, 2003, Report and Recommendation is reversed and judgment shall enter affirming the ALJ's decision.

**IT IS SO ORDERED.**